## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JODY FEES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-0476-CVE-JFJ** |
| | ) | |
| **AMERICAN FAMILY LIFE INSURANCE** | ) | |
| **COMPANY OF COLUMBUS ("AFLAC"),** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court are cross-motions for summary judgment on plaintiff's remaining claim of the breach of the duty of good faith and fair dealing (bad faith). In defendant American Family Life Insurance Company of Columbus's (Aflac's) motion for summary judgment (Dkt. # 83), it argues that plaintiff Jody Fees cannot satisfy the required elements of his claim. Plaintiff responds (Dkt. # 95) that defendant's employees continually overlooked material facts and failed to adequately investigate plaintiff's claim at every level of the claims handling process, demonstrating systemic institutional failures that amount to bad faith. The motion is fully briefed (Dkt. ## 83, 95, 107).

In his motion for partial summary judgment (Dkt. # 81), plaintiff argues that the Court should find that he has satisfied the first three elements of the breach of the duty of good faith and fair dealing as a matter of law. He also argues that the defense of unclean hands is not available to defendant. In response (Dkt. # 94), defendant argues that plaintiff has not submitted evidence to support the claim of bad faith and that the highly unusual facts of the plaintiff's case make defendant's mistaken analysis reasonable. Defendant also argues the defense of unclean hands is appropriate where plaintiff allegedly misrepresented his employment history and received a windfall

by receiving unemployment benefits in addition to short-term disability benefits.  The motion is fully briefed (Dkt. ## 81, 94, 108).

This is the Court's second summary judgment opinion.  In the first opinion, issued on June 5, 2020 (Dkt. # 48), the Court denied defendant's motion for summary judgment on plaintiff's claims for breach of contract and breach of the duty of good faith and fair dealing (Dkt. # 19).  First, summary judgment was denied on the breach of contract claim because the undisputed material facts made it clear that "the plaintiff met all of the pre-requisites for short-term disability benefits under the Policy."  Dkt. # 48, at 12.  The Court determined that the plain terms of the policy required payment of benefits if–while a claimant had a Full-Time Job–an "Off-the-Job Injury causes [claimant's] Total Disability within 90 days of [claimant's] last treatment for [claimant's] covered . . . Off-the-Job Injury."[1]  Id. at 2.  Benefits terminated either where claimant's physician allowed claimant "to perform the material and substantial duties of [claimant's] Full-Time Job" or where claimant worked "at any job."  Id.  The Court found plaintiff qualified for Total Disability under the policy where (1) plaintiff suffered an Off-the-Job injury in August 2016, (2) plaintiff was working a Full-time Job for Forrest Shoemaker AC, Inc. (Forrest Shoemaker)  at the time of the injury, (3) plaintiff's August 2016 injury was the cause of plaintiff's December 5, 2017 surgery, (4) the surgery was a "treatment" that occurred within 90 days of plaintiff's Total Disability, and (5) the treatment

---

[1]     Capitalized terms herein are defined in the policy and in some instances in the Court's earlier opinion and order.  As relevant here, "Off-the-Job Injury" is defined as "an Injury that occurs while you are not working at any job for pay or benefits."  Dkt. # 48, at 2.

of surgery resulted in a physician's determination that plaintiff was unable to perform the material and substantial duties of his Full-Time Job.  Id. at 11-12.[2]

Second, summary judgment was denied on plaintiff's bad faith claim because the Court did not have enough information before it regarding defendant's internal and investigative efforts in handling the claim.  Id. at 16-17.  The Court now turns to the issue of whether either party has satisfied the summary judgment standard at this juncture with respect to the bad faith claim.  As such, only those facts relevant to that inquiry are included here.[3]

## I.

### A. Plaintiff's Employment, Short-Term Disability, and Insurance Coverage

A thorough review of the summary judgment record demonstrates the following chronology of events:  on January 27, 2015, while employed by York Plumbing, Inc. ("York"), plaintiff applied to defendant for accident insurance and short-term disability insurance policies. Dkt. ## 83, at 7; 95, at 10.  The application for the disability policy contained the following language:

> Coverage is not provided for an illness, disease, infection, disorder, condition or injury for which, within the 12-month period before the Effective Date of coverage, medical advice, consultation, or treatment was recommended or received, or for which symptoms existed that would ordinarily cause a prudent person to seek diagnosis, care, or treatment. Disability caused by a Pre-existing Condition, including deliveries for children conceived prior to the Effective Date of coverage or reinjuries to a Pre-existing Condition will not be covered unless it begins more than 12 months after the Effective Date of coverage.

Dkt. # 83-3, at 23.

---

[2]     Following the ruling, defendant issued payment to plaintiff for the short-term disability benefits at issue, plus interest. Dkt. ## 81, at 13; 95, at 14.  As a result, plaintiff dismissed his claim for breach of contract (Dkt. # 80). Dkt. ## 83, at 8; 95, at 10.

[3]     Facts relating to the breach of contract claim are set forth in detail in the Court's June 5, 2020 opinion and order (Dkt. # 48).

On February 2, 2015, defendant issued a short-term disability insurance policy to plaintiff ("the policy"). Dkt. ## 83, at 7; 95, at 10.  The policy provides a monthly disability benefit of $2,500 due to an injury or sickness, following a 14-day Elimination Period,  for a maximum of six months in the event of Total Disability and three months in the event of Partial Disability.  Dkt. ## 83, at 8; 95, at 106.  The policy defines Total Disability as "being under the care and attendance of a Physician due to a condition that causes you to be unable to perform the material and substantial duties of your Full-Time Job, and not working at any job." Dkt. ## 83, at 8; 95, at 10.  The policy defines Partial Disability as "being under the care and attendance of a Physician due to a condition causes you to be unable to perform the material and substantial duties of your Full-Time Job, but able to work at any job earning less than 80 percent of your Annual Income of your Full-Time Job at the time you became disabled."  Dkt. ## 83, at 8-9; 95, at 10.  "Full-Time Job" means "one job at which you work 19 or more hours per week for one employer for pay or benefits." Dkt. ## 83, at 9; 95, at 10.  The policy requires different conditions to be met and provides different coverage based on whether claimant is a full-time employee at the time the covered injury occurs.  The policy differentiates as follows:

**A. TOTAL DISABILITY BENEFITS:**

**1. Working Full Time:** If you have a Full-Time Job at the time of your Sickness or Off-the-Job Injury, we will insure you as follows while coverage is in force:

If your covered Sickness or covered Off-the-Job Injury causes your Total Disability within 90 days of your last treatment for your covered Sickness or covered Off-the-Job Injury, we will pay you the Daily Disability Benefit for each day of your Total Disability. This benefit is payable up to the Total Disability Benefit Period you selected and is subject to the Elimination Period shown in the Policy Schedule. Also see the Uniform Provision titled "Term," and the definition of "Benefit Period."

4

You will no longer be qualified to receive this benefit upon the earlier of your: (1) being released by your Physician to perform the material and substantial duties of your Full-Time Job, or (2) working at any job.

**2. Not Working Full Time:** If you do not have a Full-Time Job at the time of your Sickness or Off-the-Job Injury, we will insure you as follows while coverage is in force:

If you are unable to perform three or more [Activities of Daily Living ("ADLs")] within 90 days of your last treatment that is a result of a covered Sickness or Off-the-Job Injury, as certified by a Physician, and you require Direct Personal Assistance to perform such ADLs, we will pay you the Daily Disability Benefit for each day you cannot perform such ADLs. This benefit is payable up to the Total Disability Benefit Period you selected and is subject to the Elimination Period shown in the Policy Schedule. Also see the Uniform Provision titled "Term," and the definition of "Benefit Period."

You will no longer be qualified to receive this benefit upon the earlier of your: (1) being released by your Physician to perform the material and substantial duties of your Full-Time Job, (2) working at any job, or (3) Physician no longer being able to certify that you are unable to perform three or more ADLs that require Direct Personal Assistance.

Separate periods of Disability, resulting from the same or a related condition and not separated by 180 days or more, are considered a continuation of the prior Disability. Once the maximum Total Disability Benefit Period has been paid, you will not be eligible for a new Total Disability Benefit Period for Disability due to the same or a related condition, until 180 days after you: (1) have been released by a Physician from the prior Disability, (2) are no longer disabled, and (3) are no longer qualified to receive any Disability benefits under this policy.

Dkt. ## 83, at 9-10; 95, at 10. The policy defines Activities of Daily Living ("ADLs") as "activities used in measuring your level of personal functioning capacity. Normally, these activities are performed without Direct Personal Assistance, allowing you personal independence in everyday living." Dkt. ## 83, at 10; 95, at 10. The ADLs are:

1. Bathing: washing oneself by sponge bath or in either a tub or shower, including the task of getting into or out of the tub or shower;

2. Maintaining continence: controlling urination and bowel movements, including your ability to use ostomy supplies or other devices such as catheters;

3. Transferring: moving between a bed and a chair, or a bed and a wheelchair;

4. Dressing: putting on and taking off all necessary items of clothing;

5. Toileting: getting to and from a toilet, getting on and off a toilet, and performing associated personal hygiene; and

6. Eating: performing all major tasks of getting food into your body.

Dkt. ## 83, at 10; 95, at 10.

Plaintiff was insured under the policy from February 2, 2015 until April 8, 2018. Dkt. ## 81, at 16; 94, at 12. Plaintiff alleges that he was owed benefits due to a Total Disability from December 5, 2017 to April 7, 2018. Dkt. ## 83, at 8; 95, at 10. After accounting for the Elimination Period, the amount of benefits in dispute was $9,166.30. Dkt. ## 83, at 8; 95, at 10.

Plaintiff's employment with York terminated in the summer of 2016. Dkt. ## 83, at 11; 95, at 10. On July 28, 2016, plaintiff started working at Forrest Shoemaker as a plumber. Dkt. ## 83, at 11; 95, at 10. On or about August 21, 2016, while employed full-time by Forrest Shoemaker, plaintiff twisted his left knee while walking down a boat ramp. Dkt. ## 81, at 6-7; 94, at 12. Plaintiff visited Dr. Dukes on August 22, 2016, for evaluation of the knee. Dkt. # 83-3, at 328. Dr. Duke's ordered an MRI to evaluate the knee (id.), which was done on August 25, 2016. Id. at 326. On September 12, 2016, plaintiff presented for his follow-up visit with Dr. Dukes. Dr. Dukes told plaintiff that the MRI "had some new changes," which included a tear of the lateral meniscus. Id. at 331. Dr. Dukes stated that plaintiff's injury did not require surgical intervention, but noted "[i]f he starts having mechanical symptoms, I would like to see him back," and that he "would be happy to proceed with surgical arthroscopy" in the event of recurrent pain or new mechanical symptoms.

Id. at 332.  Plaintiff returned to Dr. Dukes on August 23, 2017, for "pain particularly with squatting and crouching type activities." Id., at 337; Dkt. ## 81, at 7; 94, at 12.  The progress notes stated that his last MRI revealed a vertical tear of his meniscus.  Dkt. # 83-3, at 337.  Dr. Dukes ordered an updated MRI and recommended proceeding with surgical arthoscopy.  Id. at 338; Dkt. ## 81, at 7; 94, at 12. On December 5, 2017, plaintiff underwent left knee arthroscopic surgery to repair a lateral meniscal tear.  Dkt. ## 83, at 12; 95, at 10.

Plaintiff was working full-time as a plumber until September 22, 2017, when his employment with Forrest Shoemaker terminated.  Dkt. ## 83, at 11; 95, at 10.  Thereafter, plaintiff filed for unemployment benefits after being terminated.  Dkt. # 83-5, at 5.  Plaintiff testified to receiving between $300 and $400 per week in unemployment benefits from the time he was terminated from Forrest Shoemaker to sometime between February and April 2018.  Dkt. # 83-6, at 4-6.  On October 10, 2017, while receiving unemployment, plaintiff filed articles of organization for a limited liability company named J&L Plumbing, LLC, and received a certificate reflecting the formation of that company.  Dkt. # 83-3, at 452.   Plaintiff stated he was working full-time for J&L Plumbing, LLC in December 2017 (prior to surgery).  He stated he was reaching out to potential clients, and researching operating agreements and tools.  Dkt. # 83-6, at 8-10.  Plaintiff continued this work in January 2018.[4] Id. at 13-15.  Plaintiff does not appear to have derived any income from this venture prior to April 2018.

---

[4]     While plaintiff disputes the relevance of facts relating to his unemployment benefits, and to a certain extent his efforts to start a new company, the Court finds these facts are demonstrated by the record and have not been disputed by plaintiff.

**B. Short-Term Disability Claim and Subsequent Communications**

Two days after plaintiff's knee surgery, on December 7, 2017, Dr. Dukes completed an "Initial Disability Claim Form–Physician Statement," which was sent to defendant. Dkt. ## 83, at 12; 95, at 10; Dkt. # 83-3, at 34-36. The form stated plaintiff was diagnosed with a left lateral meniscal tear and chondromalacia of the patella and had surgery to correct those issues. Dkt. # 83-3, at 34-38. The portion of the form that asked "if due to an accident, please give the date, details and location of the accident" was blank. Id. at 34. Dr. Dukes stated that plaintiff first consulted the doctor "for this condition" on January 17, 2015 and that plaintiff had an "ongoing history of left knee pain." Id. The second page of the physician statement listed the "[f]irst date of disability" as December 5, 2017, and the "[d]ate the patient was last treated" as August 23, 2017. Id. The next question, whether the patient was "currently working," was left unanswered. Under "[d]ate the patient was released to return to work," Dr. Dukes wrote plaintiff would be released to work on April 5, 2018. Id. at 36. The form also included a section that asked "if the patient has not been released to return to work, or if the patient is working light duty, please provide the next appointment date or the expected return to work date." The date written on the form was December 18, 2017. Id. The form further asked "if the patient is not employed, or employed less than 30 hours, which activities of daily living (ADLs) is the patient unable to perform (Please note this does not apply to all policies)?" Id.; Dkt. ## 83, at 12; 95, at 10. Dr. Dukes stated that the patient would have difficulty "transferring," noting that the patient did not require direct personal assistance to perform ADLs but that the "patient may need help with transfers and getting to and from [appointments]." Dkt. # 83-3, at 36. The final two pages of the fax contained a detailed summary of the surgery. Id. at 37-38.

8

On or about December 15, 2017, plaintiff filed a claim for short-term disability benefits under the policy through Aflac agent Corey MacIntyre. Dkt. ## 81, at 7; 94, at 13. Plaintiff wrote on the claim form that Dr. Dukes sent in the physician portion of the disability claim. Dkt. # 83-3, at 44. On December 19, 2017, defendant sent plaintiff a letter stating that, to complete its review, it needed an "Employer Statement." Dkt. ## 81, at 7; 94, at 13. The letter stated "the Employer Statement must be signed by someone who has the authority to verify the policyholder's employment. The Employer Statement cannot be signed by the policyholder, unless the policyholder is self-employed." Dkt. # 83-3, at 48.

On December 29, 2017, MacIntyre told plaintiff that defendant needed "office visit notes from your doc for what caused the disability and a separate letter stating you cannot perform 3 [ADLs]" and asked "[w]hen was the last time you were employed?" Dkt. ## 81 at 8; 94, at 13. On January 8, 2018, Dr. Dukes completed progress notes for plaintiff indicating the plaintiff's physical restrictions (i.e., no lifting, pushing, pulling, kneeling, squatting, climbing, or stooping), which were sent to MacIntyre. Dkt. # 83-3, at 55; Dkt. ## 81 at 8; 94, at 13. On January 9, 2018, MacIntyre provided Dr. Dukes' notes to defendant. Dkt. ## 81 at 8; 94, at 13. That same day defendant requested an "Employer Statement" from plaintiff, again via letter. Dkt. # 83-3, at 66.

On January 18, 2018, MacIntyre told plaintiff that he "spoke to a rep at [defendant] headquarters and they said they actually need two years of tax returns," and that "[w]e already submitted 2016." Dkt. ## 41, at 13; 42, at 9. Plaintiff provided his 2015 income tax return to MacIntyre who submitted it to defendant on January 22, 2018. Dkt.# 83-3, at 101. Defendant sent a third letter on January 23, 2018, requesting an employer statement. Id. at 109. On January 30, 2018, MacIntyre notified plaintiff that defendant required a completed employer statement. Dkt. ##

9

81, at 8; 94, at 13.  On February 1, 2018, MacIntyre submitted the employer statement directly to Forrest Shoemaker, plaintiff's former employer.  Dkt. ## 81, at 8; 94, at 13.  MacIntyre received the completed form and submitted it to defendant on February 9, 2018.  Dkt. ## 81, at 8; 94, at 13.  The employer statement was completed by Norma Clift at Forrest Shoemaker. Dkt.# 83-3, at 115.  The form did not state a date under the section "first date of disability" but did state that the "disability" did not occur while at work.  The form further stated that plaintiff was not still employed, but that plaintiff had worked at Forrest Shoemaker from July 28, 2016 to September 22, 2017.  Id.  On February 16, 2018, MacIntyre told plaintiff that the submission of the employer statement triggered the opening of an entirely new claim and apologized for the lengthy claims handling process.  Dkt. ## 81, at 8; 94, at 13.  That same day, defendant mailed plaintiff a letter asking plaintiff to provide "[t]he enclosed Attending Physician's Statement completed in its entirety by the Physician, including the Disability section if filing for disability."  Dkt. ## 81, at 8; 94, at 13; Dkt. # 83-3, at 130.

Four days later, on February 20, 2018, defendant sent a letter to plaintiff denying short-term disability payments.  Dkt.# 83-3, at 132; Dkt. ## 81, at 9; 94, at 13; 83, at 13; 95, at 10.  Defendant noted that, based on the information submitted, benefits were not payable because "the policy provides benefits beginning on the 15th day of disability. The information submitted indicates this period of disability was less than 15 days."  Dkt. # 83-3, at 132.  The period of disability stated in the subject line was December 6, 2017 to December 17, 2017.  Id.

After the initial denial, on February 23, 2018, Dr. Dukes completed a second physician's statement. Dkt. ## 83, at 15; 95, at 10.  This statement again stated the first date of disability was December 5, 2017.  Dkt. ## 83, at 15; 95, at 10.  In response to the question "if the patient has not been released to return to work or if the patient is working light duty, please provide the next

appointment date or expected to return to work date," Dr. Dukes wrote "patient may return to work on 4/5/2018 (Full Duty)."  Dkt. # 83-3, at 134.  The form stated that patient did not require direct personal assistance to perform ADLs.  Id.  The second page of the form stated that the diagnosis was a lateral meniscus tear and chondromalacia of the patella.  Id. at 136.  In response to the question "if due to an accident, please give the date, details and location of the accident," Dr. Dukes wrote that, in August 2016, plaintiff stated he was walking down a boat ramp when he had some increased knee pain.  The form stated symptoms first occurred in August 2016 and that the patient first consulted the doctor for this condition on August 22, 2016.  Id. at 136.  Dr. Dukes also submitted an "Accidental Injury Claim Form – Physician's Statement," which included the dates of treatment for the injury and treatment notes for each of the following dates:  August 22, 2016; September 12, 2016; August 23, 2017; and December 18, 2017.  In the treatment notes from August 22, 2016, Dr. Dukes stated the injury was "either a new injury or possibly some referred pain."  Id. at 139. Treatment notes from August 23, 2017 state that plaintiff "has had some ongoing pain for over a year now.  At this point I am going to recommend that we get an updated MRI with the anticipation that we are going to go ahead and proceed with surgical arthroscopy of his left knee." Id. at 140.

On February 26, 2018, plaintiff also made a claim under the accident policy.  Dkt. ## 81, at 9; 94, at 13.  He submitted an accidental injury claim form completed by Dr. Dukes.  Dkt. # 41-3, at 32-35.  Defendant processed and issued payment on the same immediately.  Dkt. ## 81, at 9; 94, at 13.

On March 5, 2018, plaintiff contacted defendant to check the status of his short-term disability claim and was notified that defendant needed additional information related to ADLs. Dkt. ## 81, at 9; 94, at 13.  Plaintiff submitted an executed HIPAA release to defendant on April 2, 2018.

On April 2, 2018, plaintiff also faxed a form, "Claims Authorization to Obtain Information," which authorized Dr. Dukes to release to defendant information otherwise covered by HIPAA. Dkt. ## 81, at 9; 94, at 13; Dkt.# 83-3, at 202.   On April 3, 2018, defendant mailed plaintiff a letter acknowledging that "we received your claim; however, as we mentioned in a previous letter, we have not received all the information we need to review the claim.  Since we cannot complete our review of the claim without the required information, we must, unfortunately, close the claim.  If we receive the following information, we will reopen the claim: Please submit the supporting medical records the [sic] contains the activities of daily living requirements." Dkt. ## 81, at 9; 94, at 13; Dkt.# 83-3, at 177.  Plaintiff called defendant on April 10, 2018 and requested that it utilize the medical authorization previously provided.  Dkt. ## 81, at 9; 94, at 13.  The call log indicates that defendant advised plaintiff that the claim was denied because the request for ADL information was still pending. Dkt. # 83-3, at 181.  One week later, on April 17, 2018, defendant contacted Dr. Dukes, requesting "a statement from you advising whether or not the patient required 'Direct Personal Assistance,' as defined below, each and every time she [sic] was unable to perform [ADLs]." Dkt. # 83-3, at 189.  Dr. Dukes responded on May 7, 2018, stating "patient requested assistance from Dec 5 thru April 4th due to knee surgery. Patient requested the need for assistance with transportation to and from destination and to help get to and from appointments. Patient also needed help maintaining household duties and maintaining the care of his daughter due to being a single parent during this time." Id. at 191; Dkt. ## 81, at 9; 94, at 13.

On May 7, 2018, MacIntyre resubmitted the employer statement from Forrest Shoemaker, along with plaintiff's 2015 and 2016 income tax returns, Dr. Dukes' first physician's statement, Dr. Dukes most recent letter, and plaintiff's executed HIPAA authorizations.  Dkt. ## 81, at 10; 94, at

13.  On May 8, 2018, defendant requested "a copy of the medical documentation beginning from treatment date December 5, 2017 through April 5, 2018 for review" from Dr. Dukes.  Id. at 197.  On May 8, 2018 the same request was sent to plaintiff, addressed "Dear Medical Records."  Id. at 200; Dkt. ## 81, at 9; 94, at 13.  On June 6, 2018, defendant wrote to plaintiff again, addressing plaintiff as "Ms. Fees," and asked that plaintiff submit "the supporting medical documentation that contains the activities of daily living for review." Dkt. ## 81, at 10; 94, at 13; Dkt. # 83-3, at 211. On June 12, 2018, defendant received Dr. Dukes' surgical report and progress notes from December 18, 2017, and January 15, 2018.  Dkt. ## 81, at 10; 94, at 13.

On June 18, 2018, defendant issued its second denial of plaintiff's claim.  Dkt. ## 81, at 10; 94, at 13.  The letter stated "[a]fter carefully reviewing the claim, we have determined that benefits are not payable for the following reason(s):  This claim has been reviewed previously and no payment is due. Enclosed please find a copy of our previous correspondence."  Dkt. # 83-3, at 244.  The enclosed letter was the initial denial from February 20, 2018, which stated the claim was denied because plaintiff's disability did not extend past the policy's Elimination Period.  Dkt. ## 81, at 10; 94, at 13.

The next communication was on July 17, 2018, when Dr. Dukes wrote to defendant.  This letter stated that plaintiff underwent left knee surgery for a partial lateral meniscal tear that left him unable to return to his work as a plumber after surgery.  Dkt. # 83-3, at 248.  Dr. Dukes stated he could be reached for further discussion.  Id.

On October 28, 2018, plaintiff's attorney, Mark Heidenreiter, wrote to defendant regarding the claims process.  The letter stated that all information required to pay the claim was attached.  Dkt. ## 81, at 10; 94, at 13; Dkt. # 83-3, at 254-98.  The attached information included Dr. Dukes'

13

second physician statement, dated February 23, 2018, and a new progress note from September 26, 2018.  The second physician statement stated that plaintiff had been injured in August 2016, and indicated that treatment had been intermittent until surgery was determined to be the appropriate course of action.  Dkt. # 83-3, at 254-60.  Dr. Dukes stated plaintiff was not authorized to return to work until April 5, 2018, and that plaintiff did not require assistance to perform ADLs. Id. at 256-59. The new progress note sought to clarify plaintiff's condition.  The note stated that plaintiff's knee issues began in August 2016, and continued until surgery in December 2017.  Id. at 260.  The report stated that Dr. Dukes believed plaintiff could not work until April 8, 2018 due to the physical restrictions from the surgery.  Id.  The report also included the treatment and surgical notes of plaintiff's previous knee issues, which purportedly resolved on March 7, 2016. Id. at 263-80.  The letter also included plaintiff's MRI reports, which indicated the August 2016 MRI was ordered because plaintiff twisted his knee on August 21, 2016 going down a boat ramp.  The MRI notes state "there is a new partial thickness . . . which does not present on the prior exam and likely represents new nondisplaced vertical tear."  Id. at 281.

On November 6, 2018, another letter was sent to "Ms. Fees" stating that the claim submitted required more research; it did not request new information.  Dkt. # 83-3, at 446.  On November 9, 2018, defendant's internal notes show that Heidenreiter's letter was received with additional documentation for the claim, but that "medical records do not indicate that the insured meets 3 or more ADLs or require direct personal assistance."  Id. at 445.  The note states that plaintiff "denied not meeting ADLs." Id.

On November 9, 2018, defendant responded to plaintiff regarding Heidenreiter's October 28, 2018 letter.  The first paragraph noted that defendant had received the request to review a claim "for

the disability period beginning December 15, 2017." Dkt. # 83-3, at 476.  The letter acknowledged that the employer statement submitted on February 9, 2018 confirmed that plaintiff was employed until September 22, 2017.  Id.  The letter stated the policy provided benefits "if you are working full-time and a covered . . . Off-the-Job injury causes you to become totally disabled."  Id. at 476; Dkt. ## 81, at 10; 94, at 13.  The letter went on to state if you are not working at a Full-Time Job, "benefits will be provided if, due to a covered . . . Off-the-Job Injury, you are unable to perform three or more [ADLs], as certified by a physician, and you require 'Direct Personal Assistance' to perform such ADL's [sic]."  Dkt. # 83-3, at 476.  Defendant claimed plaintiff had failed to demonstrate an inability to perform the ADLs.  Dkt.  ## 81, at 10; 94, at 13.

On November 18, 2018, Heidenreiter responded to defendant's November 9, 2018 letter to plaintiff.  The letter stated this was a short-term disability claim, that plaintiff had surgery in December, that the surgery prevented plaintiff from working until April 8, 2018. Dkt. # 83-3, at 478. He noted defendant's refusal to pay, multiple document requests, and the changing claims positions potentially amounted to bad faith conduct. Dkt. ## 81, at 11; 94, at 13. The letter attached an authorization from plaintiff to contact counsel regarding plaintiff's claim.

On December 7, 2018, another letter was sent to plaintiff that stated defendant needed additional time to research the claim, but requested no new information.  Dkt. # 83-3, at 448.  On December 14, 2018, defendant issued its fourth denial.  Dkt. ## 81, at 11; 94, at 13.  Defendant notified Heidenreiter that the policy provided "benefits if, while you are employed at a Full-Time Job, you are totally or partially disabled due to a covered Sickness or covered Off-the-Job Injury" and denied plaintiff's claim.  The stated reasoning was that plaintiff had failed to substantiate an inability to perform ADLs. Dkt. ## 81, at 11; 94, at 13.  The letter states "[o]n the February 23, 2018

Physician's Statement under question number 11, Dr. Dukes marked 'No' indicating that Mr. Fees did not require Direct Personal Assistance to perform ADLs." Id. at 482.  The letter quotes Dr. Dukes' September 26, 2018 progress notes, stating "Mr. Fees is here predominantly to discuss his long-term disability claim with AFLAC.   I am here to help clarify and resolve any miscommunication regarding this. This is specifically regarding Mr. Fees' left knee … Therefore, he underwent arthroscopic surgery of his left knee on December 5, 2017." Id. at 483. The portion of Dr. Dukes' notes omitted by the ellipses discussed plaintiff's history of knee pain and the August 2016 and August 2017 MRIs that preceded the surgery.  Id. at 305.

On January 21, 2019, Heidenreiter responded to the December 14, 2018 denial.  Id. at 450. Heidenreiter stated that plaintiff was working full-time prior to the surgery, and attached information regarding J&L Plumbing.  Id. at 450, 452-53.  He stated that, per the benefits section of the policy, "if your disability is caused by a . . . covered Off-the-Job Injury and occurs while this coverage is in force" then benefits are payable to the claimant.  Id. at 450.  The letter then noted that plaintiff had a similar procedure in 2015 and that Aflac paid the claim with no issue.  The letter inquired as to why disability caused by pregnancy did not require proof that the claimant could not complete ADLs. Lastly, the letter noted that plaintiff has paid Aflac in good faith over the years and now, because he "was out of work due to a knee injury (which was not work related)" defendant was refusing to pay his claim.  Id. at 450-51.  The letter also noted that "every letter [plaintiff] receives states a new reason for denying the claim," which appears to be bad faith. Id. at 451.

On February 6, 2019, defendant sent a letter to "Ms. Fees" indicating that defendant required time to conduct additional research.  Id. at 466.  On February 18, 2019, defendant sent plaintiff another letter "acknowledging receipt of a claim."  Id. at 468.  On March 7, 2019, defendant

responded to Heidenreiter's January, 21, 2019 letter, stating that defendant was still researching the claim. Id. at 470.

On March 29, 2019, another letter was sent to plaintiff. Id. at 471-472. This letter stated that additional information was needed to complete the review of the claim. This letter requested "documentation to support that you were working at the time you became disabled," such as copies of any contracts or payments received with dates. Id. at 471. The letter went on to note that defendant's review of the documents had revealed additional benefits that had not been paid to plaintiff, relating to the August 25, 2016 MRI, the August 30, 2017 MRI, the physical therapy on December 28, 2017, and the September 26, 2018 follow-up appointment with Dr. Dukes. Id. at 471. On April 17, 2019, defendant sent a second letter to plaintiff requesting additional information "to support that you were working at the time you became disabled." Id. at 473.

On May 17, 2019, defendant issued its fifth denial of plaintiff's claim. Dkt. ## 81, at 11; 94, at 13; Dkt. ## 83, at 19; 95, at 10. For the first time, defendant stated the basis of the denial was that plaintiff was not working at the time he became disabled. Dkt. ## 81, at 11; 94, at 13. It noted the previous two requests for information were not answered. The letter states that the policy requires that plaintiff become disabled "while working at a Full-Time Job," or, in the alternative, plaintiff must demonstrate the need for direct personal assistance in performing at least three ADLs. Dkt. # 83-3, at 474. The letter stated that there was no medical evidence the plaintiff required direct personal assistance with any ADLs, and so he failed to meet that requirement. Id. at 475. The letter further stated that this was the second appeal made on the claim and plaintiff had the right to three appeals. Defendant noted the right to appeal expires 180 days from the original appeal decision and

explained that, because the original decision was rendered on November 9, 2018, the 180 day period had expired.[5]  Id. at 475.

It is undisputed that, in handling claims made by Oklahoma insureds, defendant is obligated to comply with applicable Oklahoma law and prevailing insurance standards.  This requires  that defendant perform reasonably thorough and timely claims investigations;  handle claims with a functional knowledge of the language of its insurance policies and the law applicable to the same; and implement "reasonable standards for prompt investigations of claims."  Dkt. ## 81, at 14-15; 94, at 14; see also OKLA. STAT. tit. 36, § 1250.5.

Defendant does not dispute that more than twenty of defendant's employees participated in the handling of plaintiff's claim.  Dkt. ## 81, at 13; 94, at 14.  Nor does defendant dispute that the employees responsible for handling plaintiff's claim did not understand the terms of the policy, and that plaintiff's claim was denied as a result.  Dkt. ## 81, at 13; 94, at 14.  Defendant does not dispute that plaintiff's claim was not handled in compliance with defendant's internal claims-handling standards.  Dkt. ## 81, at 13; 94, at 14.  Defendant does not dispute that the claim went under a process called "legal review," where defendant's employees provide claims-handling employees feedback on claims-related issues and guidance related to specific policy language.  Dkt. ## 81, at 13; 94, at 14.

It is also undisputed that, since instituting litigation on July 30, 2019, defendant has paid plaintiff the full amount of benefits plaintiff claims that he is owed.  This amounts to a total of $11,392.84 ($9,166.30 in benefits, $2,106.99 in interest, and a premium refund of $119.55).  Dkt.

_____

[5]        The Court notes that the period expired on or about May 8, 2019, which is before the denial letter was issued.

## 83, at 19; 95, at 10.  Plaintiff now seeks $22,032,854.30 in damages relating to his bad faith claim, in addition to punitive damages.  Dkt. ## 83, at 19; 95, at 10.  This amounts to more than 2,400 times the amount of the underlying benefits at issue.[6]

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could

---

[6]    The Court notes that this damages claim could be characterized as ludicrous, and, if awarded by a jury, would likely not be sustained on post-verdict review.

reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

### A. Bad Faith

"Under Oklahoma law, an insurer has an implied duty to act in good faith and deal fairly with its insured." Porter v. Farmer Ins. Co., Inc., 505 Fed. App'x 787, 791 (10th Cir. 2012) (unpublished) (citing Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1093 (Okla. 2005)).[7]  "Violation of this duty gives rise to an action in tort." Id. (citing Bannister v. State Farm Mut. Auto. Ins. Co., 692 F.3d 1117, 1123 n. 8 (10th Cir. 2012)).  "The elements of a bad faith claim against an insurer for delay in payment of first-party coverage are: (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." Ball v. Wilshire Ins. Co., 221 P.3d 717, 724 (Okla. 2009).  "The absence of any one of these elements defeats a bad faith claim." Id.

"A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing." Badillo, 121 P.3d at 1093-94.

---

[7]    Unpublished decisions are not precedential, but they may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

"[B]ad faith cannot exist if an insurer's conduct was reasonable under the circumstances." Barnes v. Okla. Farm Bureau Mut. Ins. Co., 11 P.3d 162, 170-71 (Okla. 2000)); Beers v. Hillory, 241 P.3d 285, 293 (Okla. Civ. App. 2010) ("Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law."). "[T]he minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award against said insurer." Badillo, 121 P.3d at 1094. Evidence of an insurer's "internal negligence is not probative of the issue of bad faith. Bad faith and negligence are not synonymous." Peters v. American Income Life Insurance Co., 77 P.3d 1090, 1098 (Okla. Civ. App. 2002). "[T]he essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy, and if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact." McCorkle v. Great Atl. Ins. Co., 637 P.2d 583, 587 (Okla. 1981); see also Badillo, 121 P.3d at 1093.

"The investigation of a claim may in some circumstances permit one to reasonably conclude that the insurer has acted in bad faith. This is particularly true if the manner of investigation suggests that the insurer has constructed a sham defense to the claim or has intentionally disregarded undisputed facts supporting the insured's claim." Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1442 (10th Cir. 1993); see also Bannister, 692 F.3d at 1128. "The primary question in a bad faith claim for failure to investigate or settle a claim is: what did the insurance company know, or what should it have known at the time the insured requested payment under the applicable policy, i.e., whether the insurer had a justifiable, reasonable basis to withhold payment when the insured

requested the carrier to perform its contractual obligation." Pitts v. Western American Ins. Co., 212 P.3d 1237, 1240 (Okla. Civ. App. 2009) (quotation marks omitted). To overcome a motion for summary judgment on the issue of inadequate investigation, plaintiff "must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information that would have delegitimized the insurer's dispute of the claim." Bannister, 692 F.3d at 1128 (quotation marks omitted). "The mere allegation that an insurer breached the duty of good faith and fair dealing does not automatically entitle a litigant to submit the issue to a jury for determination." Oulds, 6 F.3d at 1436 (citing City Nat'l Bank & Trust Co. v. Jackson Nat'l Life Ins., 804 P.2d 463, 468 (Okla. Civ. App. 1990)). "A jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct." Id. In determining whether summary judgment is appropriate the Court must consider "under the facts of the particular case and as a matter of law, whether [defendant's] conduct may be reasonably perceived as tortious." Id. If the Court finds that insurer acted reasonably as a matter of law, summary judgment is warranted. See Skinner v. John Deere Ins. Co., 998 P.2d 1219, 1223 (Okla. 2000).

Defendant seeks summary judgment on plaintiff's bad faith claim, arguing plaintiff fails to meet several required elements. To prevail on his bad faith claim, plaintiff must show (1) he is entitled to benefits under the policy, (2) defendant had no reasonable basis for denying his claim, (3) defendant did not deal fairly and in good faith with plaintiff, and (4) defendant's violation of its duty of good faith and fair dealing was the direct cause of plaintiff's injury. Ball, 221 P.3d at 724. Therefore, to prevail on summary judgment, defendant must show that at least one element of the claim fails as a matter of law. To that end, defendant argues that, (1) in light of the defendant's

unemployment benefits and "full-time job" working for himself, plaintiff is not entitled to any benefits; (2) defendant's initial denials were reasonable given the complex nature of the claim; (3) that evidence shows that defendant went out of its way to deal with plaintiff fairly and in good faith; and (4) plaintiff cannot show injury when he received a windfall. Dkt. # 83, at 21-24. Defendant also seeks summary judgment on plaintiff's claim for punitive damages.

In his motion for partial summary judgment (Dkt. # 81), plaintiff seeks summary judgment on the first three elements of his bad faith claim. Plaintiff states that there is no dispute as to whether plaintiff's claim should have been paid, and that the second and third elements of a bad faith claim are satisfied where defendant's investigation was unreasonable and resulted in numerous wrongful and unjustified denials. Dkt. # 81, at 16-21.

As to the first element of a bad faith claim, as discussed in the Court's prior opinion, plaintiff met all of the pre-requisites for short-term disability benefits under the Policy.[8]  Defendant's argument that plaintiff's "windfall" of unemployment would reduce his benefits under the policy is unsupported by the language of the policy. Defendant presents no policy language that would allow defendant to lawfully withhold plaintiff's short-term disability payment if plaintiff were simultaneously receiving unemployment.  Further, defendant's argument that plaintiff's work on his business constitutes "working at any job," and thus cuts short his disability period, is also not supported by the policy language. The policy consistently qualifies the phrase "working at any job"

---

[8]     The Court ruled that the terms of coverage were met (Dkt. # 48), but did not have a summary judgment motion of plaintiff before it and did not rule that the benefits were payable, when they were payable, or if the contract was breached.  Thereafter, the claim was paid by defendant and the breach of contract claim was dismissed (Dkt. #80). Plaintiff and defendant can stipulate to this issue at trial, but the Court will not rule on the first element as a matter of law.

with the phrase "for pay or benefits," in defining Full-time Job, Off-the-Job Injury, and On-the-Job Injury in Part 1: Definitions of the policy. Dkt. # 83-3, at 8 (emphasis added). Absent that qualification, a claimant could be denied benefits based on "working any job" in many circumstances where he was not working for pay or benefits, but technically could be considered to be "working" in some capacity, leading to an absurd result. As a result, the Court finds defendant's arguments regarding the first claim element unavailing.

As to defendant's arguments on the second and third elements, when this matter was before the Court in June, the Court found that whether defendant was in possession of the information that plaintiff's August 2016 injury was the Off-the-Job Injury and whether defendant failed to investigate that injury would be at issue in the bad faith inquiry. In that opinion, the Court stated that if defendant "was in possession of this information, then it had no reasonable basis for delaying payment and did not deal fairly and in good faith with plaintiff." Dkt. # 48, at 14. Based on the current summary judgment record, the Court finds that, while defendant was in possession of all the necessary information to pay plaintiff's claim in February 2018, a question of reasonableness still exists. The issue of reasonableness arises because of the purportedly unusual nature of the facts of plaintiff's claim. The Court cannot find as a matter of law whether the length of time that elapsed between the injury and the date of disability made an unusual, prolonged, and ineffective claims-handling response otherwise reasonable. At a minimum, the Court finds that plaintiff has met his burden to overcome defendant's motion, where plaintiff was able to show "that material facts were overlooked or that a more thorough investigation would have produced relevant information." Bannister, 692 F.3d at 1131 (quotation marks omitted). The record demonstrates that, from February

23, 2018 forward, the material fact of and date of plaintiff's Off-the-Job injury was, at the very least, overlooked.

Further, "[a] jury question arises . . . where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct." Oulds, 6 F.3d at 1436.  The Court finds that the facts summarized in section I above permit differing inferences regarding the reasonableness of defendant's claims-handling procedures and investigation, and whether defendant was justified in its actions and dealt fairly and in good faith with plaintiff.  See Pitts v. Western American Ins. Co., 212 P.3d 1237, 1240 (Okla. Civ. App. 2009) ("The primary question in a bad faith claim for failure to investigate . . . is: . . . whether the insurer had a justifiable, reasonable basis to withhold payment when the insured requested the carrier to perform its contractual obligation.") (quotation marks omitted).  Only a fact finder can resolve:  (1) whether the basis for the initial denial–that the period of disability did not exceed the Elimination Period–was reasonable, justifiable, and in good-faith; (2) whether the stated reason for the second denial–that no benefits were due because it had previously been determined that no benefits were due–was reasonable, justifiable, and in good-faith; (3) whether the other reason for the second denial–that the period of disability did not exceed the Elimination Period–was reasonable, justifiable, and in good-faith; (4) whether the four-month period between the first and second denial was reasonable, justifiable, and in good-faith; (5) whether, after receiving all medical evidence required to pay the claim from plaintiff's attorney, Heidenreiter, defendant's third and fourth denials, based on plaintiff's inability to show direct personal assistance was required, were reasonable, justifiable, and in good-faith; (6) whether it was reasonable, justifiable, and in good-faith for defendant not to request any additional information

before issuing its third and fourth denials; (7) whether defendant's two month delay[9] prior to issuing the fifth denial was reasonable, justifiable, and in good-faith; (8) whether it was reasonable, justifiable, and in good-faith for defendant to misstate its own policy in multiple denial letters sent to plaintiff and plaintiff's attorney, while quoting other portions of the policy language; (9) whether defendant's requests for information were reasonable, justifiable and in good-faith; and (10) whether the fact that defendant made no inquiries as to the originating injury mentioned in the documents or what prompted plaintiff's MRIs was reasonable, justifiable, and in good-faith.[10]   Ultimately, these issues as to whether defendant's delay, failure to investigate, and failure to understand its own policies are reasonable, justified, and in good-faith are for the jury to resolve.  Because genuine disputes of material fact exist, the Court cannot find that defendant's actions were either reasonable or unreasonable as a matter of law.  As such, the Court must deny defendant's motion for summary judgment and plaintiff's motion for partial summary judgment as to bad faith.  Further, because the Court finds that the reasonableness of defendant's actions are a matter for the jury, the Court declines to rule on the issue of punitive damages.

### B. Defendant's Affirmative Defense of Unclean Hands

Plaintiff also seeks summary judgment on defendant's affirmative defense of unclean hands because the defense is an equitable one, not a legal one.  Dkt. # 81, at 23.  Plaintiff further argues that defendant has not presented any evidence to support this defense.  Id. at 25-28.  Defendant

---

[9]    Defendant sent at least two self-styled "delay" letters in this time (id. 466, 470; see also id. at 468).  Dkt. # 83-3, at 463.

[10]   Although defendant's internal notes demonstrate knowledge of an August 22, 2016 injury date (id. at 465), defendant never mentioned or inquired of plaintiff about any injury prior to the December 5, 2017 date of disability.

responds that the defense of unclean hands is available in light of plaintiff's alleged employment misrepresentations and subsequent receipt of money from defendant based on those representations. Dkt. # 94, at 8-12.

"[T]he doctrine of unclean hands is an equitable defense." Campbell v. A.S.A.P. Assembly, Inc., No. CIV-13-0815-HE, 2013 WL 6332975, at *2 (W.D. Okla. Dec. 5, 2013). "The standard is that 'he who seeks equity must come into the court with clean hands.'" Id. (quoting Hocker v. New Hampshire Ins. Co., 922 F.2d 1476, 1486 (10th Cir. 1991). The equitable defense of unclean hands is one that "can be raised to defeat an equitable remedy, but not one that defeats other remedies. Courts repeatedly refer to the defense [of unclean hands] in that light." See id.; (quoting DAN DOBBS, LAW OF REMEDIES § 2.4(2) at 93 (2d ed. 1993)). Where plaintiff seeks only monetary damages, the doctrine of unclean hands will not apply. Id.

Plaintiff's sole remaining theory of recovery is defendant's breach of the duty of good faith and fair dealing. Dkt. #81, at 23 n.3. This is an action at law. Defendant cites no cases that apply the doctrine of unclean hands to bar legal remedies. The cases defendant cites instead confirm that the doctrine of unclean hands applies to equitable remedies. See, e.g., Springfield Holding Co. LLC v. Stone, 335 F. App'x 699, 706 (10th Cir. 2009) ("The Stones also contend that the district court erred by granting an equitable remedy to a party who it found to have 'unclean hands.' The unclean hands doctrine means, in general, that equity will not aid a party whose conduct has been 'unlawful, unconscionable, or inequitable.'") (emphasis added); In re Macco Properties, Inc., 540 B.R. 793, 887 (Bankr. W.D. Okla. 2015) ("A plaintiff requesting equitable relief 'must come with clean hands.'") (quoting Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806,

814 (1945)).  As a result, the doctrine of unclean hands is inapplicable to plaintiff's legal claim.  The Court grants plaintiff's motion for partial summary judgment as to this defense.

      **IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 83) is **denied**.  Plaintiff's motion for partial summary judgment (Dkt. # 81) is **granted in part and denied in part** as follows: it is **granted** as to the equitable defense of unclean hands; it is **denied** on all other grounds.

      **DATED** this 15th day of October, 2020.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE